UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
_____x

JILL PREJEAN,

             Plaintiff,                              Case No. 20-cv-8018 (JPO)

                                             SECOND AMENDED
v.                                            COMPLAINT


INFOSYS LIMITED, MARK LIVINGSTON,
DAN ALBRIGHT, and JERRY KURTZ,
Jointly and severally,

             Defendants.

_____x

       Plaintiff, JILL PREJEAN (hereinafter "Plaintiff") by and through the undersigned counsel

Mirer Mazzocchi & Julien PLLC, files this complaint against Defendants INFOSYS LIMITED,

MARK LIVINGSTON, DAN ALBRIGHT, and JERRY KURTZ, and for her complaint, she

alleges as follows:

**NATURE OF THE ACTION**

       1.     Plaintiff was hired by Infosys Limited (hereafter "Infosys" or "Defendant

Company") in October of 2018 to do the difficult job of finding and recruiting hard-to-find

executives whose skills qualified them for jobs as partners or vice presidents to work for Infosys

in its one-billion-dollar consulting division.

       2.     Plaintiff had a long history of and experience in successfully placing very hard-to-

find executive talent in similar positions in Fortune 500 companies.

3.      When Plaintiff joined Infosys as a senior HR professional, she was shocked to find a rampant culture of illegal discriminatory animus among the partner level executives based on age, gender and caregiver status.

4.      When Plaintiff tried to change this culture within the first two months of her employment, she was met with resistance from Defendants Kurtz and Albright who became hostile in the face of her objections and sought to circumvent her authority in order to evade compliance with the law.

5.      Yet when a new supervisor, now CEO, Defendant Mark Livingston was hired, Plaintiff received an *order* to institute such unlawful hiring criteria and her objection to such resulted in a direct and immediate threat to her job,  and ultimately did cost her job.

6.      Specifically, Defendant Livingston demanded that Plaintiff not put forward candidates for jobs who were over 50 years of age and women who had children at home.

7.      The minute Plaintiff stated she could not comply with this discriminatory directive and advised Defendant Livingston that his request was unlawful and in violation of the company's internal compliance directives, Defendant Livingston told her he would have her job outsourced in retaliation.

8.      Informed of these retaliatory threat and unlawful discrimination by Defendant Livingston by Plaintiff, the senior Company executives who were involved in her hire vowed to protect Plaintiff.

9.      Yet they failed to do so and instead allowed Defendant Livingston to remain in his position of authority despite repeated complaints of discrimination and retaliation.

10.      That is, the Company protected the discriminators, not Plaintiff who sought to protect the Company and follow the law.

2

11.     Despite Plaintiff's complaints to other VPs and SVPs in the company immediately after these threats, no action was taken to protect her job, to end the unlawful retaliation, nor to discontinue the discriminatory practices which Plaintiff resisted and which Defendant Livingston nonetheless imposed through unlawful questioning of applicants regarding their age and caregiver status by himself and others  including Defendants Albright and Kurtz, whom engaged in a joint campaign of retaliatory harassment against Plaintiff.

12.     Instead, Plaintiff found only empty promises to protect her.

13.     Indeed, this open and notorious retaliation continued for four months during which time Plaintiff was subjected to hostility by Defendant Livingston and Defendants Albright and Kurtz on a weekly basis due to her unwillingness to break the law.

14.     As Defendant Livingston stated, if Plaintiff "would not do it"—meaning discriminate against consulting candidates—he would find someone who would.

15.     In or about February or March 2019,  Plaintiff filed  a formal complaint to Human Resources, with the support of two of the executives responsible for her hire, that the company had discriminated against a highly qualified female candidate by not hiring her.

16.     On the heels of this protest of this gender discrimination, in April 2019, completely unchecked in his unlawful actions, Defendant Livingston made good on his threats of retaliation, and was able to get authority to demand Plaintiff's termination from her employment in accordance with a plan he had first announced months prior directly after Plaintiff's refusal to engage in discriminatory acts, and thereafter repeated on a weekly basis.

17.     Upon information and belief, Defendant Livingston was promoted to CEO after the company was aware of his unlawful acts.

18.     Moreover, the Company's failure to take remedial action after Plaintiff's numerous

complaints is indicative of an underlying culture of unlawful discrimination of which Plaintiff was warned by a VP, to whom she reported, on her first day at work, where the VP expressed fear for his job due to a *de facto* Company policy of replacing older workers.

19.     This VP was an HR executive at the company for fifteen years and was well aware of the company's predilection to force out older executives.

20.     Accordingly, Plaintiff brings this action under the NYCHRL for retaliatory termination and a retaliatory hostile work environment created by Defendant Livingston  along with Defendants Albright and Kurtz.

21.     Plaintiff also brings NYCHRL claims for age discrimination, consistent with Defendant Livingston's express retaliatory animus against employees over the age of 50 and the animus of partners made express to her prior to Defendant Livingston's hire.

22.     This action seeks compensatory and punitive damages to secure future protection and to redress the past deprivation of rights secured to Plaintiff under the New York City Human Rights Law.

## JURISDICTION AND VENUE

23.     Plaintiff's claims arise in part under New York City Human Rights Law.

24.     This action was removed to this Court pursuant to 28 U.S.C. §1332.

25.     Venue is proper in the Southern District of New York under 29 U.S.C. §1391, as the majority of events giving rise to these claims occurred within this District.

## PARTIES

Plaintiff

26.     Plaintiff, Jill PreJean (hereinafter referred to as "Plaintiff" ) is a 62-year-old female who is a resident of the State of New York, County of New York.

4

27.     At all times relevant Plaintiff was over the age of 50.

28.     At all times relevant Plaintiff was employed by Defendant Infosys and based out of Defendant Company's One World Trade Center office.

29.     Specifically, at all times relevant Plaintiff performed the role of Vice President of Talent Acquisition for Infosys.

30.     At all times relevant since Defendant Livingston's hire to the termination of Plaintiff's employment, Plaintiff was supervised by Defendant Livingston as her primary hiring authority.

31.     At all times relevant Plaintiff directly reported to VP Kelley.

Defendants

*Defendant Infosys Limited*

32.     Defendant INFOSYS LIMITED (hereinafter "Infosys" or "Defendant Company") is a multi-billion-dollar multinational corporation founded in India, which provides computing and other technology services to companies throughout the world.

33.     Defendant Infosys is a foreign corporation incorporated in and has its headquarters in India.

34.     Infosys maintains its New York headquarters at One World Trade Center, Suite A, 79th floor, 285 Fulton St., New York, NY 10007.

35.     At all times relevant to this action, Infosys conducted and transacted business in the State and City of New York and continues to do so.

36.     At all times relevant Defendant Infosys was Plaintiff's employer for purposes of the NYCHRL.

37.     At all times relevant, Defendant Infosys controlled Plaintiff's hiring, firing,

discipline and pay.

38.     At all times relevant Defendant Infosys controlled the means and manner of Plaintiff's performance of her work.

*Defendant Mark Livingston*

39.     Defendant MARK LIVINGSTON (hereafter "Defendant Livingston") is an adult individual residing in Arizona.

40.     From in or about December 2018 to the present, Defendant Livingston was Senior Vice President, now CEO, of the Consulting Division for Defendant Infosys.

41.     Defendant Livingston at all times was based out of Arizona and visited the One World Trade Center office an average of three times per month.

42.     Thus Defendant Livingston regularly conducted business in this judicial district.

43.     During their overlapping tenure, Defendant Livingston supervised all of Plaintiff's work on a daily basis.

*Defendant Dan Albright*

44.     Defendant DAN ALBRIGHT (hereafter "Defendant Albright") is an adult individual residing in New Jersey

45.     At all times relevant Defendant Albright was Vice President of the Consulting Division for Defendant Infosys.

46.     Defendant Albright at all times was based out of Atlanta and visited the One World Trade Center office an average of five times per month.

47.     Thus Defendant Albright regularly conducted business in this judicial district.

*Defendant Jerry Kurtz*

48.     Defendant JERRY KURTZ (hereafter "Defendant Kurtz") is an adult individual residing in New Jersey

49.     At all times relevant, Defendant Kurtz was Vice President of the Consulting Division for Defendant Infosys.

50.     Defendant Kurtz at all times was based out of New Jersey and visited the One World Trade Center office an average of five times per month.

51.     Thus Defendant Kurtz regularly conducted business in this judicial district.

## FACTUAL ALLEGATIONS

### October 2018: Plaintiff Is Hired To Recruit Executives For The Consulting Division

52.     Plaintiff is a human resources executive with more than twenty years' experience in the field of Human Resources ("HR") recruiting executives for top level jobs in major corporations.

53.     Plaintiff knows well and prided herself on rigorous compliance with all applicable local, state and federal laws during her tenure as an HR executive and at all times managed the hiring process with order and integrity within the bounds of the law.

54.     In the fall of 2018, Plaintiff was contacted by a recruiter who requested that she meet with Mr. Rohit Sharma, Assistant Vice President of Talent Acquisition for Defendant Infosys (hereafter "AVP Sharma").

55.     Shortly thereafter, Plaintiff met with AVP Sharma at the One World Trade Center office of Defendant Infosys.

56.     After meeting with Plaintiff for approximately an hour, AVP Sharma invited the Global Head of Talent Acquisition, his supervisor Senior Vice President Mr. Rajesh Ahuja, to join the interview (hereafter "SVP Ahuja").

57.     After the interview, both AVP Sharma and his supervisor SVP Ahuja indicated a strong interest in hiring Plaintiff for the position of Vice President of Talent Acquisition for Defendant Company.

58.     Both AVP Sharma and SVP Ahuja were based in New Jersey and visited the New York office on average four times per month.

59.     Plaintiff then underwent the next interview by phone with Houston-based Vice President of Talent Acquisition Mr. Clint Kelley (hereafter "VP Kelley").

60.     After several further interviews, AVP Sharma, VP Kelley, and SVP Ahuja decided to offer Plaintiff the position.

61.     Thus, Plaintiff's hire was based on the recommendations of the executives running the Talent Acquisition group at Infosys and the offer was extended by VP Kelley.

62.     In extending his offer VP Kelley stated he looked for Plaintiff to create, establish and lead the internal talent acquisition function and assured Plaintiff a long tenure with the Company.

63.     Upon information and belief, AVP Sharma, VP Kelley, and SVP Ahuja took Plaintiff to be much younger than her actual age when making the decision to hire her.

64.     In October 2018 Plaintiff was hired by Infosys as a Vice President of Talent Acquisition.

65.     At the time of her hire she was required to submit documents revealing her age to be 59 years.

66.     Plaintiff was hired at a base salary of $180,000 with a bonus of 35%, for an approximate annual salary of $240,000 plus benefits.

67.     Plaintiff's specific assignment was to serve the Head of Infosys's Consulting

Division, Mr. Ken Toombs (hereafter "SVP Toombs").

68.     Her job was to recruit and put forward for hire persons at the partner and vice president level for the Defendant Company's Consulting Division, which generates in excess of a billion dollars a year in revenue.

**Plaintiff Is Informed Of The Company's Age-Related Animus Immediately Upon Her Hire**

69.     On the first day of work at One World Trade Center, Plaintiff was invited to lunch by VP Kelley, who was in town from Dallas.

70.     Much to Plaintiff's surprise and dismay, much of the lunch was taken up with VP Kelley openly discussing the Company's age-related animus and his fears of being laid off due to his age.

71.     VP Kelley is in his fifties and is several years younger than Plaintiff.

72.     Plaintiff felt threatened and warned by this admission by a senior HR executive.

73.     She was also concerned that she had agreed to work for a company which generated fears of age discrimination in high executives, and which seemed to engage in a pattern of unlawful discrimination.

74.     VP Kelley had worked for Defendant Company for more than fifteen years at that time and upon information and belief was well acquainted with the specific details of the Company's pattern and practice of laying off executive level employees over the age of 50.

75.     Plaintiff understood VP Kelley's concerns to be an admission of age-related animus on the part of his supervisor SVP Ahuja and SVP Ahuja's higher ups, the President, the CEO and the senior executives reporting to the CEO.

76.     Plaintiff was shaken by this conversation, and despite her recent hire, reasonably feared that her employment would be terminated due to her age, as revealed only after the offer of

employment was extended.

77.     Thereafter Mr. Kelley continued to express his fear of being fired due to his age at least once a month.

78.     For the entirety of Plaintiff's employment Mr. Kelley continued to express this sentiment regarding the company's animus against older executives, every three to four weeks, effectively reminding her she could be subject to unlawful termination on a regular basis.

79.     Despite these ongoing threats and/or warnings, Plaintiff during this period excelled at her job and received accolades from executives in the consulting division and executives in talent acquisition.

80.     At the time of her hire, there were no internal processes or procedures in place for recruiting executives within Talent Acquisition.

81.     Based on her experience, Plaintiff built an executive candidate pipeline from the ground up through which she recruited candidates for specific executive positions.

82.     In recruiting several highly qualified individuals, she received only accolades from AVP Sharma, VP Kelley, as well as SVP Ahuja.

### **Plaintiff Finds A Pervasive Culture Of Illegal Aminus and Defendants Kurtz And Albright Become Hostile To Plaintiff When She Objects To Illegal Criteria**

83.     Shortly after her initial meeting with Mr. Kelley, Plaintiff made a request to Mr. Toombs to receive a list of all current partners in order to meet with all partners regarding their hiring needs.

84.     When Mr. Toombs was not available, Plaintiff proceeded to gather the partner list from Mr. Kelley and through her own inquiries.

85.     After approximately a month, Plaintiff had a complete partner list and began taking meetings with partners regarding their hiring needs.

86.     Consistently in these meeting with Plaintiff, partners talked openly about their hiring prejudices and discrimination preferences.

87.     These illegal criteria were more important to partners than anything else.

88.     Plaintiff consistently heard from at least a dozen partners, to her shock, that they preferred not to hire additional consultants of Indian national origin, that they wanted women without children at home, and candidates not approaching 50.

89.     These preferences were open and notorious and seemed to be the company culture.

90.     In each of her meetings Plaintiff apprised the partners that they were advancing illegal criteria and that she would not act on them.

91.     Among the partners who endorsed illegal criteria were Defendants Kurtz and Albright, who expressly stated them to Plaintiff.

92.     When Plaintiff apprised Defendants Kurtz and Albright individually that the criteria were illegal, as she did all partners—unlike most of the partners, who generally accepted the limit placed by Plaintiff, Defendant Kurtz and Albright each appeared to take this limit as the beginning of a battle for control.

93.     Plaintiff was extremely troubled by this pervasive culture of illegality, and by Defendant Kurtz and Albright's response.

94.     On one occasion before Defendant Livingston was hired, Plaintiff raised these concerns with in house counsel/compliance officer, and explained the response of Defendants Kurtz and Albright.

95.     Thereafter, after Defendant Livingston was hired, Plaintiff would raise the culture of illegality and mounting hostility described below with the in house counsel/compliance officer.

96.     The in house counsel/compliance officer acknowledged the problems but seemed

resigned to the company culture.

97.     Shortly after Plaintiff raised the illegality of their requests with Defendants Kurtz and Albright individually, Defendant Kurtz raised with Plaintiff the desire to use an outside vendor who he could speak with privately regarding his desired criteria.

98.     Defendant Kurtz tried to convince Plaintiff that he was her "boss" rather than those who hired her and that only he could tell her the criteria to use.

99.     Shortly before Defendant Livingston arrived, Defendant Kurtz yelled at Plaintiff in meeting in front of other partners that he wanted her to comply with his illegal demands so that they would be in place at the time the new SVP arrived.

100.     This was extremely humiliating to Plaintiff and professionally undermining.

101.     Plaintiff saw this not only as a desire to bypass her review but to insert the illegal criteria that Plaintiff stated she would not endorse into the hiring process.

102.     During this period, Plaintiff also raised the issue with SVP Ahuja, VP Kelley and AVP Sharma and shared her concern that this was a liability to the company.

103.     Being squarely presented with the issue was a wake-up call to SVP Ahuja, VP Kelley and AVP Sharma but they relied on Plaintiff to be the one to ensure compliance.

**Mark Livingston Is Hired To Replace Ken Toombs And Begins Making Unlawful Demands Of Plaintiff To Exclude Qualified Candidates Based On Age, Gender And Family Status, Retaliating With Threats Of Termination When She Stated She Would Not Comply With An Illegal Demand**

104.     In December 2018 Mr. Toombs resigned from his position and was replaced by Defendant Livingston who held the title of SVP Consulting.

105.     With SVP Toombs' departure, Defendant Livingston became Plaintiff's day-to-day supervisor.

106.    Defendant Livingston worked closely with Defendants Albright and Kurtz, who reported to him.

107.    In or about early December 2018 Plaintiff met with Defendant Livingston for an in person "meet and greet."

108.    A few days later Plaintiff met Defendant Livingston again in person at One World Trade Center.

109.    At this meeting Defendant Livingston informed Plaintiff of the type of applicants he wanted her to recruit for the consulting division.

110.    Among his demand for "heavyweights" and "superstars," Defendant Livingston also expressed it was crucial to hire women and exclude women "with children at home" and candidates "approaching or over 50."

111.    While Plaintiff was shocked by this open unlawful demand, it appeared Defendant Livingston seemed to be adopting or parroting the Company culture of unlawful discrimination admitted in the express illegal hiring criteria put forth previously by the partners Plaintiff had met, including Defendants Kurtz and Albright.

112.    In response, Plaintiff immediately objected, informing Defendant Livingston that she would recruit all qualified candidates, and refused to inquire as to age or women's caregiver status.

113.    She informed him the inquiries into a candidate's age, and a female candidate's caregiver status were themselves forbidden.

114.    Defendant Livingston seemed entirely unphased by the fact that his demand was illegal.

115.    Rather Defendant Livingston was well aware of the illegality of the demand and

appeared disturbed and angry at Plaintiff's objection, attempting to bully her into taking his unlawful direction.

116.    Immediately in response to Plaintiff's statement that she opposed Defendant Livingston's orders to discriminate against people on the basis of age and/or gender, Defendant Livingston stated that if Plaintiff would not make the forbidden inquiries of candidates, he would find a way to remove her and outsource the position, to find a vendor that would violate the law.

117.    Plaintiff was shocked by this direct threat to her job.

118.    Greatly distressed by this threat, Plaintiff began to fear that Defendant Livingston would make good on his plan to further retaliate against her.

**<u>Plaintiff Reports Livingston's Demand To Discriminate To And Retaliatory Threat To Her Job VP Kelley To No Avail</u>**

119.    Immediately after the meeting with Defendant Livingston, Plaintiff called VP Kelley and relayed the threat to her job made for refusing to discriminate on the basis of age and/or gender.  VP Kelley was outraged and told Plaintiff that he would protect her job. He stated that he would not permit her to be fired.

120.    VP Kelley promised to raise this threat with AVP Sharma and SVP Ahuja.

121.    VP Kelley remarked that it was bold of Defendant Livingston to state his unlawful desire so openly, further stating, "Mark Livingston is a lawsuit waiting to happen."

122.    Plaintiff continued to feel threatened as she was aware that VP Kelley did not have the authority to direct Defendant Livingston's actions, given that Defendant Livingston was the SVP of an over billion-dollar division while Ahuja was SVP of service. Defendant Livingston's power and influence was only second to the President of Infosys.

123.    Nonetheless she hoped that the report to SVP Ahuja, and the fact that Defendant

Livingston's demands were blatantly illegal, would result in an investigation or discipline of Defendant Livingston and protection of her job.

124.    After making this complaint to all three executives, Plaintiff received no follow up from the Company.

125.    At that time and upon information and belief VP Kelley did in fact inform SVP Ahuja of the unlawful request made by Defendant Livingston.

**Livingston Subjects Plaintiff To Gender Based Hostility Due to Gender**

126.    During this period until her termination, Plaintiff was consistently condescended to and undervalued by Defendant Livingston, consistent with his gender-based animus against female caregivers.

127.    Indeed, due to Plaintiff's gender, Defendant Livingston at all times failed to treat her as a high-level executive.

128.    Rather, at various times, he treated her like a secretary, asking her to assist with his computer problems or other administrative tasks

129.    Defendant Livingston consistently spoke to Plaintiff in a way that undervalued her contribution. Only when Plaintiff greatly excelled in a task, would he praise her work.

130.    That is, Plaintiff was required to work harder than her male colleagues to receive the same recognition.

131.    Defendant Livingston spoke to Plaintiff in a condescending manner as though she was an administrative assistant; her professional opinion did not matter and she was not worth listening to.

132.    At no time did Defendant Livingston speak to Plaintiff's male colleagues in this manner.

133.    This gender-based hostility continued for the entirety of Plaintiff's tenure at the Company.

**Defendant Livingston Continues His Unlawful Demands, And Plaintiff Continues To Engage In Protected Activity**

134.    Sometime later in early December 2018, Plaintiff again met with Defendant Livingston regarding her recruitment efforts and the profile of his target candidates.

135.    Plaintiff was still needing specific and detailed hiring criteria and had yet to receive such from Defendant Livingston.

136.    Defendant Livingston continued to press the unlawful criteria he sought to impose based on age, gender and caregiver status and demanded that Plaintiff include these criteria in her prescreening of candidates.

137.    As she had during her first meeting, Plaintiff felt anxious and threatened, and feared that she would effectively have to sacrifice her job in order to protect candidates from unlawful discrimination.

138.    Despite these fears, again in response to Defendant Livingston, Plaintiff stated that age-related inquiries and caregiver inquiries of female candidates would be unlawful.

139.    In response, Defendant Livingston reiterated his retaliatory threat and escalated it, again expressly threatening Plaintiff's job and defaming her, stating, clearly her job was "too difficult and complex" for her to do.

140.    He threatened, "If you can't do it,"—meaning make the unlawful inquiry into age and female candidates' caregiver status in order to exclude candidates—he would outsource her job.

141.    Seeking to convince him that such unlawful acts were not only unlawful but also unnecessary, Plaintiff responded that she would have no problem meeting her performance

expectations within the bounds of the law.

142.    Nonetheless Plaintiff was shaken by her supervisor's repeated expressions of retaliatory animus against her, and discriminatory animus against candidates on the basis of age, gender and caregiver status.

### Plaintiff Again Reports The Unlawful Demands To VP Kelley

143.    Immediately after the meeting, Plaintiff again called VP. Kelley and relayed the retaliatory threat to him by phone.

144.    VP Kelley again informed Plaintiff that he would protect her job.

145.    He again stated he would raise Defendant Livingston's comments with AVP Sharma and SVP Ahuja.

146.    Plaintiff continued to feel threatened as she was aware that VP Kelley did not have the authority to direct Defendant Livingston's actions especially in light of the differences in power within the company.

147.    While VP Kelley stated that he would not let Defendant Livingston bully her into applying unlawful hiring criteria, Plaintiff continued to encounter the same demands from Defendant Livingston.

148.    Indeed, Defendant Livingston would soon join with Defendants  Kurtz and Albright to engage in an illegal campaign of concerted retaliatory harassment of Plaintiff.

### Plaintiff Again Reports The Unlawful Demands To SVP Ahuja Who Admitted The Retaliatory Animus Who Failed To Take Effective Remedial Action

149.    Shortly after her second complaint to VP Kelley, and during her weekly face to face meetings with AVP Sharma, and SVP Ahuja, Plaintiff reiterated to them the retaliatory threats from Defendant Livingston, of which they had been previously informed by VP Kelley. AVP Sharma was outraged, and stated Defendant Livingston must not break the law or pressure Plaintiff

to break the law or threaten Plaintiff's job. At the close of the meeting SVP Ahuja agreed with AVP Sharma and reiterated that Plaintiff's job would be protected.

150.    SVP Ahuja was clearly aware, and continually made aware by VP Kelley and Plaintiff, of the retaliatory threats, including the threat to outsource her job if she did not accede to the discriminatory demands on her made by Defendant Livingston.

151.    When Plaintiff parroted the statement of VP Kelley that Defendant Livingston "was a lawsuit waiting to happen" and AVP Sharma and SVP Ahuja agreed.

152.    Further, SVP Ahuja stated that outsourcing executive recruiting "causes chaos," is a "compliance nightmare" and would not be done under any circumstances, and certainly not for the purposes of retaliation.

153.    While Plaintiff was encouraged by these assurances, Plaintiff continued to fear for her job.

154.    Indeed, while Plaintiff continued to work and received accolades for her work in recruiting and placing partner and vice president level candidates into positions at Infosys, she continued to feel the spectre of the threat to her job from Defendant Livingston.

155.    However, no action was taken to protect her job security given the express retaliatory animus of Defendant Livingston.

156.    Further no investigation was opened into the express unlawful practice of the Consulting Division's failure to hire older people and female caregivers at the executive level

157.    Indeed, Plaintiff continued to report to Defendant Livingston until her ultimate retaliatory termination.

**Defendant Livingston Embarks On A Campaign Of Retaliatory Harassment, Along With VPs Kurtz And Albright**

158.    In the following months, Defendant Livingston, along with Defendants Kurtz and

Albright, engaged in a concerted campaign of harassment, intimidation, and threats to Plaintiff and her job, through consistent threats to bring in an outsourcing company to deprive Plaintiff of her job.

159.   Defendants Livingston, Kurtz and Albright had each made their discriminatory animus express to plaintiff and were united in their desire to retaliate against her for her protected activity.

160.   Despite this pressure campaign, Plaintiff continued to do her job competently and within the bounds of the law, presenting candidates who she believed would be successful in the job without regard to age, gender or caregiver status, into which she never inquired.

161.   Yet, after meeting candidates, Defendants Livingston, Kurtz and Albright variously stated that they did make such forbidden inquiries of the candidates in their interviews.

162.   Over the following months, Plaintiff found herself continually reiterating that these inquiries were unlawful in nature.

163.   These conversations with Defendants Kurtz and Albright occurred weekly.

164.   On a weekly basis in response to these requests to act within the bounds of the law, Defendants Kurtz and Albright reiterated their displeasure with Plaintiff not discriminating against these candidates and their desire to fire her, outsource her job and work with a particular unscrupulous vendor that would unlawfully weed out older candidates and female candidates with children at home.

165.   These conversations were hostile and appeared to be an attempt to wear down Plaintiff and have her comply with the illegal demands.

166.   Each time Plaintiff expressed concerns in regard to the aforesaid discriminatory hiring practices, these high-level executives and others in similar high-level positions responded

that Infosys' decision makers were unconcerned about such "legalities."

167.    Plaintiff was marginalized and treated like a nuisance every time she reminded these Infosys executives of such "legalities."

168.    During this time, Plaintiff talked by phone to Defendant Livingston twice a week, and at least once a week he would get angry and raise his voice when she continued to refuse to violate anti-discrimination laws in her recruiting efforts.

169.    He continued to tell her that he would outsource her job if she did not comply.

170.    These threats caused Plaintiff to be constantly anxious over a span of more than 3 months. During this time, as a result of the hostility from Defendant Livingston, Kurtz and Albright, Plaintiff developed chronic insomnia.

171.    Although AVP Sharma, VP Kelley, and SVP Ahuja continued to reassure Plaintiff in 2019 that Defendant Livingston could not make good on his threat to outsource her job, Plaintiff continued to feel distressed, disturbed and anxious. They often said, "He will not get away with this."

**Plaintiff's Protest of Discrimination By Defendant Livingston Against A Qualified Female Candidate**

172.    In February or March 2019, Plaintiff put forward for hire a highly qualified female candidate by the name of Ms. Thakur.

173.    Ms. Thakur was interviewed by many people and was positively viewed by all.

174.    It was agreed that Ms. Thakur was right for the position, however, Defendant Livingston decided to ask a male executive who Ms. Thakur had at one time supervised of his experience with her.  Mr. Livington learned that she was not "liked" by that executive because Ms. Thakur had once corrected him.

175.    Thus, while the Company purported to want to attract female candidates due to

market necessity, they consistently discriminated against them on account of their gender.

176.   Correcting a male executive was thus a reason to not hire an otherwise stellar and hire-able female executive candidate, as Defendant Livingston explained because "I can't have anyone who is not liked  on the team."

177.   Understanding this as a clear pretext and a gender-based double standard, Plaintiff spoke with SVP Ahuja and AVP Sharma about this matter, who agreed with Plaintiff's assessment that the decision not to hire her was discriminatory.

178.   They recommended that Plaintiff make a formal complaint to Human Resources, which she did, based on gender discrimination against this candidate.

179.   Shortly after making this complaint against Defendant Livingston, Plaintiff was  let go.

**April 2019: Defendant Livingston Meets With SVP Ahuja Regarding Plaintiff**

180.    April 2019, Defendant Livingston came to New York from Arizona.

181.   Plaintiff was very concerned to see him given the weekly hostility from him that pervaded her job since December.

182.   In the One World Trade Center office, Defendant Livingston met with SVP Ahuja in an open area in the office.

183.   The meeting was loud with Defendant Livingston raising his voice at SVP Ahuja.

184.   Plaintiff could see Defendant Livingston and SVP Ahuja looking over at Plaintiff suggesting that the argument involved her. It was clear Defendant Livingston was overtly and aggressively showing his anger and was demanding Plaintiff's attention.

185.   Plaintiff was very concerned that Defendant Livingston had come to New York to clinch her retaliatory termination.

186.    At the end of the meeting neither Defendant Livingston nor SVP Ahuja approached Plaintiff.

187.    Over the next two weeks Plaintiff was alarmed to find that AVP Sharma, VP Kelley, and SVP Ahuja "went quiet" and Defendant Livingston would not make decisions on matters Plaintiff sought decisions on critical hiring specializations.

188.    There was a lull in information for Talent Acquisition to share, which brought some decisions to an extended slowdown.

189.    Plaintiff was given the strong impression that Defendants Livingston, Kurtz and Albright were fighting SVP Ahuja and VP Kelley for control of Executive Talent Acquisition.

190.    By SVP Ahuja and VP Kelley "going quiet" Plaintiff reasonably believed they were losing the battle with Defendant Livingston and acquiescing to his unlawful demand to fire Plaintiff.

191.    Indeed, based on Plaintiff's experience in the industry, and her knowledge of the company, she knew Defendant Livingston did not have the authority to terminate Plaintiff as he was at the same level as Mr. Ahuja who Plaintiff directly reported to. Thus, based on information and belief, in order to obtain Plaintiff's termination, Defendant Livingston needed the approval of either the president or someone higher in the organization than Mr. Ahuja in order for Plaintiff to be terminated.  Plaintiff therefore believe that based on Defendant Livington's actions in the Office raising his voice to Mr. Ahuja, Defendant Livingston either had gotten authority from a higher level to remove Plaintiff or he threatened that he had requested it.

192.    Plaintiff asserts that absent her protected activity in raising her objections to discriminatory hiring criteria and actions, Defendant Livingston would not have demanded Plaintiff's termination.

## **Plaintiff Is Subject To Unlawful Termination Of Her Employment**

193.    Approximately two weeks after the meeting between Defendant Livingston and SVP Ajuha, on or about April 30, 2019 Plaintiff received a call from VP Kelley stating only that her "services are no longer needed. This will be your last day."

194.    Plaintiff was shocked to hear this from VP Kelley of all people.

195.    She received no previous indication of any sort from VP Kelley, nor explanation or discussion.

196.    It was clear that Defendant Livingston had gotten his way and made good on his threats.

197.    The termination of Plaintiff's employment was not justified by her performance nor by any business necessity.

198.    Indeed, during the six months of her employment Plaintiff recalls extending offers to seven partners, far outstripping the industry standard of making two partner offers in the first six months of employment.

199.    Plaintiff received continual accolades from the executives who hired her.

200.    Further, absent their hostility to her unwillingness to break the law, even Defendants Livingston, Kurtz and Albright had no other criticism of Plaintiff's results.

201.    Plaintiff far exceeded expectations, even as she spent the first few months of her job getting oriented to the company, engaging in company training, strategy building and creating complex reporting tools.

202.    Thus, it was not Plaintiff's job performance but her unwillingness to break the law at Defendant Livingston's insistence, and her filing a complaint regarding discriminatory treatment of Ms. Thakur by Defendant Livingston, which cost her her job.

203.    Here firing was also done under circumstances giving rise to an inference of discrimination given the express age- and gender-related animus held by Defendants.

204.    As a result of her termination, Plaintiff has suffered significant economic loss and significant emotional distress, humiliation, insomnia, anxiety and depression due to Defendants' unlawful acts.

205.    Plaintiff continues to feel betrayed by Defendant Company.

206.    Defendant Livingston continues to be employed by Defendant Company and was promoted to CEO of the Consulting Division, although not due to his performance.

207.    Despite applying for many jobs, Plaintiff has been unable to find comparable employment since her termination in April 2019.

208.    Upon information and belief Plaintiff's position was outsourced to a group of younger, less-qualified recruiters who would not question the discriminatory criteria regardless of legality.

209.    Upon information and belief Plaintiff was replaced by an outside vendor that did not engage in the protected activity which Plaintiff did.

## COUNTS

## COUNT I: RETALIATORY TERMINATION IN VIOLATION OF NEW YORK CITY ADMINISTRATIVE CODE § 8-107(1)(a) AGAINST DEFENDANT INFOSYS AND DEFENDANT LIVINGSTON

210.    Plaintiff repeats and re-alleges all paragraphs as though fully set forth herein.

211.    Based on those allegations, Defendants Infosys and Livingston retaliated against Plaintiff by subjecting her to retaliatory termination of her employment for her protected acts of protesting discrimination by Defendant Livingston, including the protest of gender discrimination against Ms. Thakur.

212.     As a direct and proximate result of Defendants' unlawful and retaliatory conduct in violation of the NYCHRL, Plaintiff continues to suffer emotional distress and monetary and/or economic harm, including, but not limited to, loss of future income, compensation and benefits for which she is entitled to an award of damages.

## COUNT II: RETALIATORY HOSTILE WORK ENVIREMENT IN VIOLATION OF ADMINISTRATIVE CODE § 8-107(1)(a) AGAINST ALL DEFENDANTS

213.     Plaintiff repeats and re-alleges all paragraphs as though fully set forth herein.

214.     Based on those allegations, all Defendants retaliated against Plaintiff by subjecting her to a retaliatory hostile work environment for her protected acts of protesting discrimination.

215.     As a direct and proximate result of Defendants' unlawful and retaliatory conduct in violation of the NYCHRL, Plaintiff continues to suffer emotional distress for which she is entitled to an award of damages.

## COUNT III: DISCRIMINATORY TERMINATION DUE TO AGE IN VIOLATION OF ADMINISTRATIVE CODE ¬ß 8-107(1)(a) AGAINST DEFENDANT INFOSYS AND DEFENDANT LIVINGSTON

216.     Plaintiff repeats and re-alleges paragraphs all as though fully set forth herein.

217.     Based on those allegations, Defendants Infosys and Livingston discriminated against Plaintiff by subjecting her to discriminatory termination because of her age pursuant to an unwritten company policy, practice and culture.

218.     As a direct and proximate result of Defendants Infosys and Livingston's unlawful discriminatory conduct in violation of the NYCHRL, Plaintiff continues to suffer emotional distress and monetary and/or economic harm, including, but not limited to, loss of future income, compensation and benefits for which she is entitled to an award of damages.

## COUNT IV: DISCRIMINATORY HOSTILE WORK ENVIREMENT IN VIOLATION OF ADMINISTRATIVE CODE ¬ß 8-107(1)(a) AGAINST ALL DEFENDANTS

219.     Plaintiff repeats and re-alleges all paragraphs as though fully set forth herein.

220.    Based on those allegations, all Defendants discriminated against Plaintiff by subjecting her to a discriminatory hostile work environment due to her age based on express age-related animus pursuant to an unwritten company policy, practice and culture.

221.    As a direct and proximate result of Defendants unlawful and retaliatory conduct in violation of the NYCHRL, Plaintiff continues to suffer emotional distress for which she is entitled to an award of damages.

## COUNT V: DISCRIMINATORY TERMINATION DUE TO GENDER IN VIOLATION OF ADMINISTRATIVE CODE ¬ß 8-107(1)(a) AGAINST DEFENDANT INFOSYS AND DEFENDANT LIVINGSTON

222.    Plaintiff repeats and re-alleges paragraphs all as though fully set forth herein.

223.    Based on those allegations, Defendants Infosys and Livingston discriminated against Plaintiff by subjecting her to discriminatory termination because of her gender pursuant to an unwritten company policy, practice and culture.

224.    As a direct and proximate result of Defendants Infosys and Livingston's unlawful discriminatory conduct in violation of the NYCHRL, Plaintiff continues to suffer emotional distress and monetary and/or economic harm, including, but not limited to, loss of future income, compensation and benefits for which she is entitled to an award of damages.

## COUNT VI: DISCRIMINATORY HOSTILE WORK ENVIROMENT IN VIOLATION OF ADMINISTRATIVE CODE ¬ß 8-107(1)(a) AGAINST ALL DEFENDANTS DUE TO GENDER

225.    Plaintiff repeats and re-alleges all paragraphs as though fully set forth herein.

226.    Based on those allegations, all Defendants discriminated against Plaintiff by subjecting her to a discriminatory hostile work environment due to her gender pursuant to an unwritten company policy, practice and culture.

227.    As a direct and proximate result of Defendants unlawful and retaliatory conduct in

violation of the NYCHRL, Plaintiff continues to suffer emotional distress and monetary and/or economic harm, including, but not limited to, loss of future income, compensation and benefits for which she is entitled to an award of damages.

## PRAYER FOR RELIEF

Wherefore, Plaintiff request the following relief:

a)  Back pay, including all fringe benefits;

b)  Front pay, including all fringe benefits;

c)  Compensatory damages for emotional distress and suffering;

d)  Punitive damages;

e)  Attorney's fees and costs;

f)  Such relief as is authorized by city law; and

g)  Awarding Plaintiff such other relief as the court deems just and proper.

## **JURY TRIAL**

Plaintiff demands a jury trial for all causes of action and claims for which she has a right to a jury trial.

Dated: New York, New York           Respectfully submitted,
       September 3, 2021

MIRER MAZZOCCHI & JULIEN, PLLC

__/s/_____
By: Jeanne Mirer and Ria Julien
*Attorneys for Plaintiff*
1 Whitehall St., 16th floor
New York, NY 10004
(212) 231-2235
jmirer@mmsjlaw.com
rjulien@mmsjlaw.com