UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

JILL PREJEAN,
Plaintiff,

-v-

INFOSYS LIMITED, MARK LIVINGSTON, DAN ALBRIGHT, and JERRY KURTZ,
Defendants.

20-CV-8018 (JPO)

OPINION AND ORDER

J. PAUL OETKEN, District Judge:

Plaintiff Jill Prejean brings this action against Defendants Infosys Limited ("Infosys"), Mark Livingston, Dan Albright, and Jerry Kurtz, alleging discrimination and retaliation in violation of § 8-107(1)(a) of the New York City Human Rights Law ("NYCHRL"). Before the Court are three motions to dismiss the complaint for lack of jurisdiction and failure to state a claim, one from Defendants Infosys and Mark Livingston, one from Defendant Dan Albright, and one from Defendant Jerry Kurtz. For the reasons that follow, each of these motions is denied.

## I. Background[1]

Infosys is a multi-billion-dollar multinational corporation founded in India that maintains a New York headquarters at One World Trade Center in New York City. (Compl. ¶¶ 32–34.) In October 2018, Infosys hired Prejean, then 59 years old, as a Vice President of Talent Acquisition. (Compl. ¶¶ 64–65.) Based on the hiring process, she expected to have a long tenure with the company. (Compl. ¶ 62.) On her first day, however, the employee who directly

[1] These background facts are taken from the Second Amended Complaint, Docket Number 31 ("Compl."), and presumed true for the purposes of this Opinion and Order.

extended her offer of employment, Vice President Kelley, allegedly expressed his fears to her that he himself would be fired by Infosys due to his age. (Compl. ¶¶ 70–75.) As Kelley was in fact younger than Prejean, this information caused her to worry about both potentially discriminatory behavior in the hiring practices of the company and for her own job. (Compl. ¶¶ 74–76.) Kelley allegedly continued to confide these fears to Prejean throughout her tenure. (Compl. ¶ 78.)

As part of acclimatizing herself to her new position, Prejean set up meetings with Infosys's partners to learn their hiring needs and preferences. (Compl. ¶¶ 83–85.) In these meetings, the partners allegedly expressed reluctance to hire additional consultants of Indian origin, women with children at home, and candidates over 50 years of age. (Compl. ¶ 88.) Prejean allegedly told the partners that these criteria were illegal, and most agreed not to use the criteria in the future. (Compl. ¶ 92.) Defendants Kurtz and Albright were among the partners to whom Prejean spoke, and both allegedly expressly stated these same discriminatory preferences —that they did not wish to hire candidates over 50 years of age, of Indian origin, or women with children at home — to Prejean. (*Id.*) Unlike other partners, Kurtz and Albright allegedly "appeared to take" Prejean's refusal to screen applicants based on these illegal criteria as "the beginning of a battle for control." (*Id.*) Prejean allegedly raised her concerns about discriminatory preferences and the hostility she felt from those who wanted her to hire based on discriminatory criteria to the in-house counsel, who "acknowledged the problems but seemed resigned." (Compl. ¶¶ 94–97.) After Prejean raised this with the in-house counsel, Kurtz allegedly asked to hire through an outside vendor whom he could speak to about his discriminatory hiring preferences and yelled at Prejean about the matter in front of other partners. (Compl. ¶¶ 97–100.) Prejean also raised the matter with other executives at Infosys,

who "relied on" her to "ensure compliance" with the law despite these pressures. (Compl. ¶¶ 102–103.)

In December 2018, Defendant Livingston joined Infosys as Senior Vice President for Consulting and Prejean's day-to-day supervisor. (Compl. ¶¶104–106.) Shortly after joining the firm, Livingston allegedly met with Prejean in Infosys's New York office and told her that he wished her to exclude women "with children at home" and candidates near or over 50 years old. (Compl. ¶¶ 108–110.) Prejean told Livingston that these demands were illegal, and Livingston allegedly responded by becoming "disturbed and angry." (Compl. ¶¶ 113–115.) He also allegedly threatened to remove her from her position if she did not capitulate. (Compl. ¶ 116.)

Prejean allegedly reported this interaction to Kelley, who promised to protect her job and inform other executives, and who also allegedly told her that Livingston was "a lawsuit waiting to happen." (Compl. ¶¶ 119–122.) Prejean, however, received no follow-up from Kelley or the other executives to whom he promised to relay her complaints. (Compl. ¶ 124.) Moreover, Livingston allegedly treated Prejean in a "condescending manner" and "treated her like a secretary," even though she was in fact a high-level executive herself. (Compl. ¶¶ 126–133.)

When Prejean met with Livingston again to discuss hiring parameters, he allegedly "continued to press the unlawful criteria he sought to impose based on age, gender, and caregiver status" and threatened her job if she did not comply. (Compl. ¶¶ 134–140.) Prejean again reported Livingston's alleged demands to others at the company, who allegedly reassured her that her job was safe and that these demands were illegal and unacceptable, though they did not take other action. (Compl. ¶¶149–157.) Prejean alleges that she continued to endure harassment, hostility, and pressure from Livingston, Kurtz, and Albright during the subsequent months as part of a "pressure campaign" to persuade her to discriminate when recruiting Infosys

employees. (Compl. ¶¶ 158–171.) During this period, she alleges that Kurtz and Albright engaged her in hostile conversations about once per week, and Livingston twice per week. (Compl. ¶¶ 164–165, 168–169.)

In February or March 2019, Prejean advanced a "highly qualified female candidate" named Ms. Thakur. (Compl. ¶ 172.) Livingston allegedly learned from another man whom Ms. Thakur had supervised that Ms. Thakur had corrected the man, and that that man therefore disliked her. (Compl. ¶ 174.) Thereafter, though Thakur was near-universally regarded as "right for the position," Livingston opposed her hiring. (Compl. ¶¶ 175–176.) Prejean understood this to be gender-based discrimination and reported it to other executives who agreed and recommended that she make a formal complaint, which she did. (Compl. ¶ 177–178.)

In April, Livingston visited the New York office and Prejean witnessed him having an argument with one of the executives who had been supporting her. (Compl. ¶ 180–183.) Both conversationalists allegedly looked over at her throughout their argument. (Compl. ¶ 184.) Prejean understood that their argument was about her, and that Livingston was attempting to persuade the other executive to fire her or threatening to appeal to a more senior executive to receive authority to so do. (Compl. ¶¶ 184–192.) Two weeks later, Prejean received a call from Kelley, who had until then been one of her confidants and supporters. (Compl. ¶ 193.) He terminated her employment. (*Id.*)

## II. Legal Standards

### A. Rule 12(b)(2)

"A plaintiff opposing a motion to dismiss under Rule 12(b)(2) for lack of personal jurisdiction has the burden of establishing that the court has jurisdiction over the defendant." *BHC Interim Funding, LP v. Bracewell & Patterson, LLP*, No. 2 Civ. 4695, 2003 WL 21467544,

at *1 (S.D.N.Y. June 25, 2003) (citing *Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez*, 171 F.3d 779, 784 (2d Cir. 1999)). To meet this burden where there has been no discovery or evidentiary hearing, the plaintiff must plead facts sufficient for a *prima facie* showing of jurisdiction. *Id.* As the Court evaluates a Rule 12(b)(2) motion, it must construe all of the plaintiff's allegations as true and resolve all doubts in its favor. *Casville Invs., Ltd. v. Kates*, No. 12 Civ. 6968, 2013 WL 3465816, at *3 (S.D.N.Y. July 8, 2013) (citing *Gulf Ins. Co. v. Glasbrenner*, 417 F.3d 353, 355 (2d Cir. 2005); *see also Porina v. Marward Shipping Co.*, 521 F.3d 122, 126 (2d Cir. 2008)). "However, a plaintiff may not rely on conclusory statements without any supporting facts, as such allegations would 'lack the factual specificity necessary to confer jurisdiction.'" *Art Assure Ltd., LLC v. Artmentum GmbH*, No. 14 Civ. 3756, 2014 WL 5757545, at *2 (S.D.N.Y. Nov. 4, 2014) (quoting *Jazini v. Nissan Motor Co., Ltd.*, 148 F.3d 181, 185 (2d Cir. 1998)).

Personal jurisdiction is determined in accordance with the law of the forum in which the federal court sits. *Whitaker v. Am. Telecasting, Inc.*, 261 F.3d 196, 208 (2d Cir. 2001) (citing *Bensusan Rest. Corp. v. King*, 126 F.3d 25, 27 (2d Cir. 1997)). This determination involves a two-step analysis. *See Metro. Life Ins. Co. v. Robertson-Ceco Corp.*, 84 F.3d 560, 567 (2d Cir. 1996). In New York, the court must first determine whether personal jurisdiction is appropriate pursuant to the state's general jurisdiction statute, Civil Practice Law and Rules ("C.P.L.R.") § 301, or its long-arm jurisdiction statute, C.P.L.R. § 302(a). If the court's exercise of personal jurisdiction is deemed appropriate according to New York law, the second step is an evaluation of whether the court's exercise of personal jurisdiction comports with the Fifth Amendment's Due Process Clause. *Chloé v. Queen Bee of Beverly Hills, LLC*, 616 F.3d 158, 164 (2d Cir. 2010).

### B. Rule 12(b)(6)

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a plaintiff must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A complaint is properly dismissed where "the allegations in a complaint, however true, could not raise a claim of entitlement to relief," *id*. at 558, and "where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009). Under this standard, the court must accept the plaintiff's factual allegations as true, though a "pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'" *Id.* at 678 (citing *Twombly*, 550 U.S. at 556). Determining whether a complaint states a plausible claim is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id*. at 679. Finally, in determining the adequacy of a claim under Rule 12(b)(6), a court is generally limited to the "facts stated on the face of the complaint." *Goel v. Bunge, Ltd.*, 820 F.3d 554, 559 (2d Cir. 2016) (internal quotation marks omitted).

## III. Discussion

### A. Personal Jurisdiction as to Livingston, Kurtz, and Albright

All three individual defendants contend that this Court does not have personal jurisdiction over them. A federal court generally cannot proceed to the merits of a case without first determining that it has personal jurisdiction over the defendants. *See Sinochem Intern. Co. v. Malaysia Intern. Shipping Corp*., 549 U.S. 422, 430–31 (2007). Here, Livingston argues that this Court lacks general jurisdiction over him under C.P.L.R. § 301 because he is a New Mexico

resident based out of Infosys's Texas office, does not hold property in New York, and has not engaged in purposeful business in New York as an individual. (*See* Dkt. No. 43 at 7–9.) Kurtz argues the same, with the substitution that he is a North Carolina resident who was based out of Infosys's Atlanta, Georgia office at the time relevant to the complaint, and Albright with the substitution that he is an Atlanta resident who also works out of the Atlanta office. (*See* Dkt. No. 58 at 4–5; Dkt. No. 70 at 4–5.) Prejean does not dispute general jurisdiction. (*Cf.* Dkt. No. 53 at 2.)

The defendants also each argue that this Court lacks specific jurisdiction over them under C.P.L.R. § 302, New York's long arm statute. C.P.L.R. § 302(a) allows courts to exercise personal jurisdiction over a nondomiciliary who: "(1) transacts any business within the state or contracts anywhere to supply goods or services in the state; (2) commits a tortious act within the state; (3) commits a tortious act outside the state that causes injury to person or property within the state; or (4) owns, uses, or possesses any real property situated within the state." *Karoon v. Credit Suisse Grp. AG*, No. 15 Civ. 4643, 2016 WL 815278, at *3 (S.D.N.Y. Feb. 29, 2016). Prejean contends that each defendant satisfies the first three categories. (*See* Dkt. No. 43 at 4–9; Dkt. No. 66 at 4–9; Dkt. No. 72 at 4–12.)

**i. Specific Jurisdiction under C.P.L.R. § 302**

The first consideration is specific jurisdiction as to Livingston. Prejean alleges in her complaint that Livingston met with her in Infosys's Manhattan office and, while there, made statements expressing discriminatory animus to her and threatened to retaliate against her if she did not act as he wished. (*See, e.g.*, Compl. ¶¶ 108–117, ¶¶ 134–140.) She also alleges that while Livingston supervised her, she spoke with him "twice a week" from New York, during which he would "get angry and raise his voice" when she refused to make prohibited,

discriminatory inquiries of candidates; that he "treated her like a secretary"; and that he vetoed the hiring of a highly qualified female candidate because of one comment from a man. (Compl. ¶¶ 127–131, 168–169, 172–177.) Livingston's argument, at its core, is that none of these interactions ever happened, and therefore they cannot confer jurisdiction. (*See* Dkt. No. 57 at 10–11.)

A court may consider extraneous materials, such as the defendants' affidavits (*see, e.g.*, Dkt. No. 44) in evaluating a motion to dismiss for lack of personal jurisdiction. *See Whitaker*, 261 F.3d at 208. In evaluating these materials, however, "a court must view all of the pleadings in the light most favorable to plaintiffs, resolving any doubts in plaintiff's favor." *SODEPAC, S.A. v. CHOYANG PARK in rem,* No. 02 Civ. 3927, 2002 WL 31296341, at *2 (S.D.N.Y. Oct. 10, 2002). Moreover, "plaintiffs may rely entirely on allegations of fact, and they will prevail even if the moving party makes contrary allegations which controvert their *prima facie* case." *Id.* The court must "construe the pleadings and affidavits in the light most favorable to plaintiffs, resolving all doubts in their favor." *Chloé*, 616 F.3d at 163.

In light of this standard, Prejean has sufficiently made a *prima facie* case for personal jurisdiction as to Livingston. She has alleged that Livingston engaged in "volitional acts" in which he "avail[ed] himself of the privilege of conducting activities within the forum state, thus invoking the benefits and protections of its laws," and that these acts contributed at least in part to the tortious conduct at issue in this case. *Karoon* 2016 WL 815278, at *4. This is sufficient to confer jurisdiction under § 302(a)(1). She has also alleged that he conducted tortious conduct while present in New York — e.g., his alleged expressions of animus and threats to her job — satisfying jurisdiction under § 302(a)(2). And she also alleges that he was in frequent contact with her while he was without the state, that these contacts consisted of tortious actions which

impacted her within the state, and that they were intended to induce her to hire based on discriminatory methods within this state. This satisfies personal jurisdiction under § 302(a)(3).[2] In short, Prejean has made a *prima facie* showing of personal jurisdiction under New York's long-arm statute as to Livingston under multiple theories.

Prejean's allegations as to Kurtz and Albright come in tandem. She alleges that Kurtz and Albright "expressly stated" their discriminatory hiring preferences to her; that they, along with Livingston, "engaged in a concerted campaign of harassment, intimidation, and threats to Plaintiff and her job"; and "on a weekly basis . . . reiterated their displeasure with Plaintiff not discriminating against candidates and their desire to fire her." (Compl. ¶¶ 91, 158, 160.) Again, Kurtz's and Albright's primary defense is that none of these interactions happened. (*See* Dkt. No. 59-1; Dkt. No. 71-1.)

The analysis here is much the same as above, though it is a closer case as to Albright and Kurtz. Prejean has alleged that Kurtz and Albright spoke with her on a "weekly" basis, during which they expressed discriminatory hiring preferences and threatened her job, and that they engaged in a hostile campaign aimed at her while she was working in New York. (*See* Compl. at ¶¶ 91–92, 97–99.) Furthermore, she has submitted affidavits clarifying that these incidents occurred in Infosys's Manhattan office. (*See* Dkt. No. 67-1 at 3; Dkt. No. 73-1 at 2–3.) Notably, section 302 "is a 'single act statute' and proof of one transaction in New York is sufficient to invoke jurisdiction, even though the defendant never enters New York, so long as the

[2] Also required under § 302(a)(3) is that the defendant "should reasonably expect the act to have consequences in the state and derives substantial revenue from interstate or international commerce." This is satisfied here, as Prejean alleges that Livingston directed her to perform discriminatory actions in New York State, and that he is a high-level executive in charge of an "over billion-dollar division" of a multi-national company. (Compl. ¶ 122.)

defendant's activities here were purposeful and there is a substantial relationship between the transaction and the claim asserted." *Chloé*, 616 F.3d at 170. Here, Prejean has identified several transactions, directly connected to the cause of action, that occurred within this judicial district. Prejean's allegations establish a *prima facie* showing of specific jurisdiction as to Kurtz and Albright.

**ii. The Due Process Clause**

The second step in the jurisdiction analysis is to determine whether personal jurisdiction comports with the Due Process Clause. This analysis proceeds in two parts: (1) the "minimum contacts" inquiry and (2) the "reasonableness" inquiry. *Chloé,* 616 F. 3d at 164. The minimum contacts requirement for specific jurisdiction is satisfied when "a State exercises personal jurisdiction over a defendant in a suit arising out of or related to the defendant's contacts with the forum." *Id.* This consideration is based on the "totality of the circumstances." *Id.*

As to Livingston, Prejean has alleged that he visited New York and committed tortious conduct, and also that he conducted tortious conduct without New York that he intended to have an effect within New York. She also alleges that he was in frequent contact with her while she was in New York and supervises a division that is at least in part based in New York. This suffices to establish minimal contacts as to Livingston.

Again, the case is closer as to Kurtz and Albright. However, as Prejean has alleged "weekly" contacts with New York that, in her complaint, are directly tied to this action, she has made a showing of minimal contacts as to Kurtz and Albright.

The final inquiry is as to reasonableness. Here, the court asks "whether the assertion of personal jurisdiction comports with 'traditional notions of fair play and substantial justice.'" *Id.* (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)). To determine this, courts

evaluate the following factors: "(1) the burden that the exercise of jurisdiction will impose on the defendant; (2) the interests of the forum state in adjudicating the case; (3) the plaintiff's interest in obtaining convenient and effective relief; (4) the interstate judicial system's interest in obtaining the most efficient resolution of the controversy; and (5) the shared interest of the states in furthering substantive social policies." *Id.*

The first factor weighs against jurisdiction, as requiring the out-of-state individual defendants to litigate a case in New York will pose a burden. The second factor weighs in favor of jurisdiction, as New York has an interest in protecting its citizens from discriminatory and tortious conduct, and in ensuring that hiring practices carried out in this state are fair and lawful. The third factor also weighs in favor of jurisdiction, as Prejean has an interest in adjudicating the matter in the forum where she resides and where she filed her complaint. Adjudicating this matter here would also facilitate judicial efficiency. In evaluating the fourth factor, courts "generally consider where witnesses and evidence are likely to be located." *Metro. Life Ins. Co. v. Robertson-Ceco Corp.*, 84 F. 3d 560, 574 (2d Cir. 1996). Here, this factor favors this forum; while some of the events alleged occurred via phone or electronic means, Prejean also alleges in-person events that would have occurred in New York. The fifth factor is neutral.

Accordingly, personal jurisdiction over each individual Defendant is proper under the Due Process Clause, as well as New York's long-arm statute. Their motions to dismiss under Rule 12(b)(2) fail.

### B. Independent Contractors Under NYCHRL

Defendants Infosys and Livingston next argue that Prejean cannot state a claim because she was not formally employed by Infosys. (*See* Dkt. No. 43 at 14–16.) New York's discrimination laws, however, do not apply only to nominal employees. Indeed, in the Title VII

context, the employee-employer inquiry is "a fact intensive determination that 'requires the application of the common law of agency." *Meyenhofer v. Larsen & Toubro Infotech Ltd.*, 503 F. Supp. 3d 39, 48 (S.D.N.Y. 2020). NYCHRL claims are reviewed "more liberally than their federal and state counterparts." *Loeffler v. State Island Univ. Hosp.*, 582 F. 3d 268, 278 (2d. Cir. 2009); *see also Griffin v. Sirva, Inc.*, 29 N.Y. 3d 174, 186, 76 N.E.3d 1063, 1069 (2017) (explaining that the employer-employee relationship under NYCHRL is determined under the common-law test). Accordingly, in the context of an employment discrimination suit, "the hiring party's right to control the manner and means of work[,] due to its quintessential importance in the common law conception of an employee-employer relationship," is central. *Meyenhofer*, 503 F. Supp. 3d at 46.

Prejean has alleged that she was hired after numerous interviews with Infosys executives, that an Infosys executive offered her the job, that she reported directly to Infosys executives, that Infosys executives set the expectations of her job, and that an Infosys executive ultimately fired her from it. (*See, e.g.*, Compl. ¶¶ 28–31, 55–60, 61–62, 67, 98, 105, 193–194.) These allegations suffice at this stage to establish an employer-employee relationship under New York law. *See Griffin*, 29 N.Y. 3d. at 186 (describing the test for finding an employer-employee relationship for the purposes of the NYCHRL). Thus, the court need not address the retroactive applicability of NYCHRL to independent contractors; Prejean has sufficiently alleged that Infosys employed her for the purposes of the NYCHRL.

### C. Prejean's Discrimination and Hostile Work Environment Claims as to Livingston and Infosys

Livingston and Infosys next argue that Prejean has failed to allege unequal treatment based on her own age or gender. As Infosys has submitted a partial answer to Plaintiff's retaliation claim (*see* Dkt. No. 41), the Court assumes that this argument is aimed at Count III,

discriminatory termination due to age; Count IV, discriminatory hostile work environment due to age; Count V, discriminatory termination due to gender; and Count VI, discriminatory hostile work environment due to gender.

In the Title VII discrimination context, to make a *prima facie* case and survive a motion to dismiss, "what must be plausibly supported by facts alleged in the complaint is that the plaintiff is a member of a protected class, was qualified, suffered an adverse employment action, and has at least minimal support for the proposition that the employer was motivated by discriminatory intent." *Littlejohn v. City of New York*, 795 F.3d 297, 311 (2d Cir. 2015); *see also Mihalik v. Credit Agricole Cheuvreux N. Am., Inc.,* 715 F.3d 102, 109 (2d Cir. 2013) (explaining that Title VII is a "*floor* below which the City's Human Rights law cannot fall.") Prejean alleges that she is a woman over 50 years of age, well qualified and successful at her job, and both suffered a hostile work environment and was terminated without just cause, satisfying the first three elements.[3] (*See* Compl. ¶¶ 52–53, 64–65, 79–82, 196–200.)

The final element is the inference of discrimination. "The facts required by *Iqbal* to be alleged in the complaint need not give plausible support to the ultimate question of whether the adverse employment action was attributable to discrimination. They need only give plausible support to a minimal inference of discriminatory motivation." *Littlejohn*, 795 F.3d at 311. As explained above, discrimination claims under the NYCHRL are reviewed even more liberally than their federal counterparts. *Loeffler*, 582 F. 3d 268 at 278. Moreover, under the NYCHRL, "a work environment need not be offensive, pervasive, and continuous in order to qualify as hostile." *Zick v. Waterfront Comm'n of New York Harbor*, No. 11 Civ. 5093 CM, 2012 WL

[3] The defendants dispute this last claim; however, on a motion to dismiss under Federal Rule 12(b)(6), the court takes the plaintiffs' well-pleaded factual allegations as true.

4785703, at *8 (S.D.N.Y. Oct. 4, 2012) (citing *Davis-Bell v. Columbia Univ.*, 851 F. Supp. 2d 650, 674 (S.D.N.Y. 2012). Indeed, "the totality of the circumstances must be considered" and "while courts may still dismiss 'truly insubstantial cases,' even a single comment may be actionable in the proper context." *Mihalik*, 715 F.3d at 113 (citing *Williams v. New York City Hous. Auth.,* 61 A.D.3d 62, 71, 872 N.Y.S.2d 27, 34 (2009)).

To sustain this element, Prejean alleges that Infosys employees, and Livingston in particular, regularly told her that she should not hire women with caregiving responsibilities or people over 50 and threatened her when she did not accede. (*See, e.g.*, Compl. ¶¶ 108–110.) "An inference of discriminatory intent may be derived from . . . invidious comments about others in the employee's protected group." *Littlejohn*, 795 F.3d at 312 (quoting *Leibowitz v. Cornell Univ.*, 584 F. 3d 487, 502 (2d Cir. 2009)). She also alleges that after her termination, she was replaced by "a group of younger, less-qualified recruiters." (Compl. ¶ 208.) "[A]n inference of discrimination also arises when an employer replaces a terminated or demoted employee with an individual outside the employee's protected class." *Littlejohn*, 795 F.3d at 312–313. And as to Livingston, Prejean also alleges that he spoke to her "in a condescending manner" and asked her to assist with administrative tasks, which he did not do to her male colleagues. (*See* Compl. ¶¶ 127–132.) An inference of discrimination may also arise from "the more favorable treatment of employees not in the protected group." *Littlejohn*, 795 F.3d at 312 (quoting *Leibowitz*, 584 F.3d at 502). Under the "minimal" pleading burden of a motion to dismiss, Livingston's and Infosys's argument that Prejean has not alleged unequal treatment based on her age or gender fails at this juncture. *Zimmermann v. Assocs. First Capital Corp.*, 251 F.3d 376, 381 (2d Cir. 2001).

Livingston's final argument is that Prejean cannot show that he was connected to her termination because he was not her supervisor nor responsible for her termination. This argument applies to Counts I, III, and V, all of which are based on Prejean's termination. To support his argument, however, he relies near-wholly on facts extraneous to the complaint. (*See* Dkt. No. 43 at 18.) At this stage, the Court must take Prejean's well-pleaded allegations as true. Prejean alleges that Livingston supervised her work daily, that he threatened her job directly, that he threatened to outsource her job (as was ultimately done), and that he visited New York and argued with the other executives while looking over at her shortly before her termination. (*See* Compl. at ¶¶ 30, 42, 105, 116, 134–142, 180–192.) Together, her allegations support an inference that Livingston was involved in her termination. At this time, Livingston's arguments fail.

### D. Prejean's Discrimination and Hostile Work Environment Claims as to Kurtz and Albright

Prejean brings claims against Kurtz and Albright under Count II, alleging retaliatory hostile work environment, Count IV, alleging discriminatory hostile work environment based on age, and Count VI, alleging discriminatory hostile work environment due to gender. Kurtz and Albright argue that Prejean has failed to state a claim because she has not identified specific comments from them as to their alleged hiring preferences, because she has not shown that they engaged in conduct reasonably likely to deter someone from reporting discrimination — primarily because they argue that Kurtz and Albright did not have power over Prejean under the company hierarchy — and because she has not pleaded sufficient facts that her own age and gender were motivating factors in their alleged treatment of her. (*See* Dkt. No. 58 at 15; Dkt. No. 70 at 15.) These arguments also fail.

It is true that Prejean alleges generally that "at least a dozen" employees endorsed illegal hiring preferences, but she also alleges Kurtz and Albright "expressly stated" them and did not accept Prejean's refusal to hire based on race, age or gender and caregiver status, instead reacting with hostility. (*See* Compl. ¶¶ 91–92.) As to Kurtz, she alleges that Kurtz "tried to convince [her] that he was her 'boss'" and could dictate the criteria she hired by, that he raised the possibility of replacing her with an outside vendor and yelled at her in front of the other partners. (*See* Compl. ¶¶ 97–99.) She also alleges that Kurtz and Albright "engaged in a concerted campaign of harassment, intimidation, and threats to Plaintiff and her job," including threats to outsource her job and weekly "hostile" conversations. (*See* Compl. ¶¶ 158–168.) In essence, Prejean alleges that Kurtz and Albright each specifically told her not to hire older candidates or women with caregiver responsibilities and threatened to outsource her job when she refused. These allegations, contrary to Kurtz and Albright's characterization, adequately identify Kurtz and Albright as expressing discriminatory hiring criteria that accords with Prejean's own protected class. *See Littlejohn*, 795 F.3d at 311 (explaining that "an inference of discriminatory intent may be derived from…invidious comments about others in the employee's protected group").

Kurtz and Albright next argue that Prejean has not sufficiently stated a claim for retaliation. Prejean brings her claims under the NYCHRL, which is to be "interpreted broadly and independently" in accordance with its remedial purpose. *Williams*, 61 A.D.3d 62 at 67. Accordingly, "no challenged conduct may be deemed nonretaliatory before a determination that a jury could not reasonably conclude from the evidence that such conduct was, in the words of the statute, 'reasonably likely to deter a person from engaging in protected activity.'" *Id.* at 71; *see also Mihalik*, 715 F.3d at 112 (adopting *Williams*). A jury could reasonably conclude that a

"campaign of harassment" is sufficient to deter a reasonable person from opposing discriminatory hiring practices, regardless of the power that Kurtz and Albright officially had within Infosys's hierarchy.

Finally, Kurtz and Albright allege that Prejean has insufficiently alleged that her own protected characteristics motivated their actions. Again, Prejean alleges that Kurtz and Albright repeatedly urged her not to hire candidates approaching the age of 50 or women with caregiving responsibilities — both expressions that bear on her own protected characteristics. In light of the liberal standards conveyed by *Mihalik*, 715 F.3d 102 at 113, *Williams*, 872 N.Y.S. 2d 27 at 34, and *Littlejohn*, 795 F.3d 297 at 311, Prejean has raised a sufficient inference of discriminatory motive such that it would be premature to dismiss her complaint. Kurtz and Albright's motions are denied.

## IV. Conclusion

For the foregoing reasons, the Defendants' motions to dismiss are DENIED. Defendants shall file an answer within 21 days after the date of this opinion and order.

The Clerk of Court is respectfully directed to close the motions at Docket Numbers 42, 57, and 69.

SO ORDERED.

Dated: September 30, 2022
New York, New York

J. PAUL OETKEN
United States District Judge